Doc. Number 136
Case Number 03-C-0074-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
05/03/2004 11:54:31 AM CDT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA,**

Plaintiff,

vs.

Case No. 03 C 0074 C

**PETER THORSON, MANAGED INVESTMENTS INCORPORATED, CONSTRUCTION MANAGEMENT, INC. and GERKE EXCAVATING, INC.,**

Defendant.

---

# GERKE EXCAVATING, INC.'S DAMAGES BRIEF

---

## INTRODUCTION

Defendant Gerke Excavating, Inc. ("Gerke") hereby submits its post-liability brief. The evidence submitted previously submitted by affidavit, and to be submitted to the court at the damages hearing, demonstrates and will demonstrate that:

1. That none of Gerke's actions resulted in serious violations of the Clean Water Act ("CWA");

2. That the site in question can be fully restored to the condition it was before Gerke's involvement with the site;

3. That the violation was of a technical nature without intent, knowledge or recklessness on the part of Gerke;

4. That Gerke believed its actions were in full legal compliance at the time undertaken;

5. That Gerke realized no profit or economic benefit because of the violation; to the contrary the failure to assure compliance has been economically disastrous;

6. That Gerke is not the owner of the site and subsequent to the cease and desist order Gerke attempted to remediate the site but was denied access by the owner of the site and denied the ability to proceed by the government. Gerke had access to the site for a total of three days two of which were spent placing fill;

7. That Gerke accepted the work largely on a break even basis so it could keep its employees working and there was no real profit expectation to Gerke. Gerke's bid of $42,000 was low and would not support the standard profit expectation of 2% after expenses less expenses;

8. That the single violation, to date, has cost Gerke in excess of $ 35,000;

9. That Gerke has, without exception, complied with all permit requirements, required by any jurisdiction, prior to and after the issue at hand;

10. That Gerke was a sub-contractor and that issues regarding compliance were undertaken by co-defendant Peter Thorson ("Thorson") and Gerke reasonably relied upon Thorson's assertions that Gerke's actions would be in full compliance;

In sum, the evidence presented and to be presented establishes that any penalty imposed against Gerke should be de minimis, no more than $5,000.

STATEMENT OF THE LAW

Congress has set forth a specific procedure to determine the amount of any civil judicial penalty assessed under the CWA. As stated in Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.

> [The Court] should first determine the maximum fine for which [a defendant] may be held liable. If it chooses not to impose the maximum, it must reduce the fine in accordance with the factors spelled out in section 1319(d), clearly indicating the weight it gives each of the factors in the statute and the factual findings that support its conclusions.

807 F.2d 1128, 1142 (11th Cir. 1990).

As applied in Kelly v. U.S. E.P.A. the 7th Circuit Court of Appeals and the EPA used the basis of on-site work days as the number by which the § 1319 penalty should be

calculated. It is not calculated on days of damage (days prior to remediation), but days of violation. Gerke had access to the site for three days and worked the site two days. Basing the calculation on days of damage, days the fill remains on-site, would be untenable in regards to defendants in Gerke's position who have no access to or control over the site. As the Court found in Kelly:

> On January 28 and February 1, 1994, Prisk used a backhoe to dig eight pits in the swale, deposit brush, and then cover the pits. William Meyer of the Army Corps of Engineers visited the property on February 1 and saw what Prisk was doing. Meyer and the EPA's Gregory Carlson visited the property again a few days later and observed eight covered pits, large ruts in the soil resembling tire tracks, and clots of earth bereft of vegetation. Carlson estimated that the fill activities had disturbed two of the swale's 3.5 acres and that 800 cubic yards of fill had been dumped in the swale.

Kelly v. U.S. E.P.A., 203 F.3d 519, 521 (C.A.7 (Wis.), 2000)

> The inherently imprecise decision to fine Kelly and Prisk a total of $7,000 was not grossly disproportionate to the violation of an important environmental safeguard that could have drawn a total fine of $100,000 ($25,000 civil penalty multiplied by 2 days multiplied by 2 offenders).

Id. at 524.

The court in U.S. v. Deaton, 332 F.3d 698, 703 (2003), a case relied upon by this Court in its Slip Opinion, ordered a land developer, Deaton, and his excavator to remediate a wetland parcel across which it had dug a trench after being informed that the property was subject to permitting requirements. No monetary penalty was assessed against either the developer or the excavator.

Section 1319(d) of CWA § 309(d) sets forth the following six factors which the Court shall consider in determining the appropriate penalty:

a) the seriousness of the violation or violations;
b) the economic benefit (if any) resulting from the violation;
c) any history of such violations;
d) any good-faith efforts to comply with the applicable requirements;
e) the economic impact of the penalty on the violator;
f) and such other factors as justice may require.

The amount of the penalty, pursuant to CWA § 1319 (d), is within the sound discretion of the trial court. Id. As discussed below, applying each of these factors to the violation at issue establishes that Gerke should be subject only to a de minimis fine.

Section 404(a) of the CWA grants the Corps of Engineers ("Corps") authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). U.S. v. Rueth Development Co., 335 F.3d 598, 602 (C.A.7 (Ind.), 2003). The proceedings to date have concerned the failure to obtain a NDPES permit by Thorson, the general contractor of the construction sight. The Court determined that a permit was required pursuant to its summary judgment analysis.

FACTS

The underlying facts of this case have been stated in this Court's Slip Opinion, a true and correct copy of which is attached hereto and incorporated by reference as if fully stated herein. Additional facts will be provided at the hearing on damages.

APPLICATION OF § 1309(d) FACTORS.

a) THE SERIOUSNESS OF THE VIOLATION

As is customary and usual in a general contractor/sub-contractor relationship Thorson was to determine compliance requirements and obtain a permit if necessary. Based upon the general contractor's recommendation and assurances that Gerke was in full compliance, Gerke began its fill work. Gerke was never informed by Thorson that he had spoke with Corps personnel regarding the need for a permit or had previously been denied any permit for the site. Subsequent actions were as follows:

> Norton then contacted Ron Parish of defendant Gerke Excavating and asked him whether he was aware of the wetland issues in the project. Parish told Norton that defendant Thorson had said that he had taken care of everything and that defendant Gerke had started work on the project the previous morning (March 27, 2001). Norton told Parish that he would need a permit to fill the wetlands and advised him of the penalties for filling the site without one. Parish agreed to stop work at the site. At some time on March 28, 2001, defendant Gerke and defendant Thorson executed a written contract for the excavation and filling services. (It is unclear whether the contract was executed before or after the conversation between Norton and Parish or the conversation between Norton and defendant Thorson.) The contract includes the following clause: "Gerke Excavating, Inc. will not bear responsibility for any fines or penalties assessed by government agencies for any reason prior to completion, owner shall pay for all work completed." Later that day, defendant Thorson contacted Norton and accused him of threatening defendant Gerke and forcing a work stoppage. Norton informed defendant Thorson that the Corps was preparing a cease and desist order.
>
> On March 28, 2001, the Corps issued cease and desist orders to defendants Thorson, Construction Management and Gerke. At the site the following day, Norton hand-delivered the orders to defendant Thorson and defendant Gerke's president, Richard Gerke. In response, defendant Thorson and Gerke indicated that no filling had taken place after Norton's phone calls the day before. By this time, dredged stumps, roots and other spoil material was piled on the west, north, east and southeast of the fill area. These piles remain on the site.

U.S. v. Thorson, 2004 WL 737522, 4 (W.D.Wis., 2004)

At all times subsequent to the cease and desist order Gerke has been willing to remove the fill and debris from the site. It attempted to do the same; however, it was prohibited from entering the property by Thorson, and by the U.S. attorney who, through correspondence, stated that Gerke would not be allowed on the site until the government could conclude a variety of studies, apparently for analysis and evidentiary purposes.

Gerke was not aware the site was considered a wetland. The idea that it could be was not readily apparent. It is immediately adjacent to a state highway, a local road, two businesses, and is required by the city to be mowed yearly. In fact, the Corps and the DNR have given shifting interpretations of what type of wetland is located at the site and the extent to which portion of the site are wetlands. The Court was provided evidence at summary judgment that supported the Court's conclusion that the property was technically a wetland subject to the Corps of Engineers permitting requirements. It certainly was not obviously an area of land subject to permitting requirements.

Thorson came to Gerke with an explanation that due to then recent legislation the Corps would have no jurisdiction over the site and that no permit was required. Ron Parish recent articles in the local newspaper supported Thorson's conclusion. Thorson was the general contractor and as such had the duty of compliance between the parties. Thorson provided additional assurances that, including a willingness to sign a run-of-the-mill indemnification clause in the contract, Gerke could precede without worry. Gerke then made a rational business decision to move forward. Based upon the break-even nature of the project it would have been irrational for Gerke to move forward if they believed there was any chance for them to be in violation.

In Kelly v. U.S. the court reviewed a situation were Kelly, a developer, after being mailed a permit application and being aware of the EPA's belief that the area was a wetland, continued to fill a swale to 90% of the 3.5 acres area. 203 F.3d 519, 521 (2000). The EPA ordered the fill to be removed, imposed no fine and the developer complied. See Id. Sometime latter, Kelly hired Prisk to bury debris uprooted by a flood in the swale. See Id. Prisk dug eight holes, buried the debris and capped the holes. A Corps of Engineers employee became aware of the activity and reported it. The EPA sought a penalty of $6,000 against Prisk and $4,000 against Kelly. The administrator reduced Prisk's fine to $3,000. See Id.

Here Gerke's position is analogous to that of Prisk in Kelly, however, the damage caused by Gerke was significantly less than that of Prisk. Gerke was not aware of Thorson's prior permit denials, was given a rational, although incorrect, explanation by Thorson regarding the permit and recent legislation, and preceded with the mistaken belief that the property was not regulated. The area affected was 1/9 the size of that in Kelly, who initially was not fined and was simply required to remediate the site. Prisk was fined $3,000 for his actions in excavating the holes, placing pollutants and filling the site.

b) THE ECONOMIC BENEFIT (IF ANY) RESULTING FROM THE VIOLATION

Gerke realized no benefit from the violation. It has been paid nothing for the work. It had completed $3,000 worth of work at the time of the cease-and-desist order. It was to be paid $42,000 for the entire job, which is less than 1% of its yearly receipts. At the time of the year the work was undertaken there was not sufficient work for Gerke

to run at capacity and employees were idle. The amount bid was enough to cover expenses and pay wages.

The standard profit on Gerke's is excavation work is approximately 2% after expenses. Even assuming no expenses the profit expectation was $8,160. The profit expectation was not in any way dependent on receiving or not receiving a permit. Gerke would have made no more or no less had a permit been obtained. Gerke was a sub-contractor with no further interest in the site beyond payment for the work they had contracted to undergo.

c) ANY HISTORY OF SUCH VIOLATIONS

Gerke has been engaging in excavation work since 1946. It has ongoing contracts with a variety of municipalities in addition to the commercial and private work it engages in. Not one time has Gerke ever been in non-compliance, or alleged to be in non-compliance, with any environmental regulation, permit requirement, ordinance or in any other manner either before or subsequent to the present litigation. Gerke has no business interest in its reputation being harmed with any clients, particularly municipalities.

d) ANY GOOD-FAITH EFFORTS TO COMPLY WITH THE APPLICABLE REQUIREMENTS

Gerke has been ready and willing to reenter the property and remove the fill from the day of the initial cease and desist order. It, however, has not been able to enter. Gerke attempted to enter the site and analyze the work to be done but was denied access to the site by Thorson to do any work. The U.S. has additionally placed road blocks to the removal of the fill through its requirements that settlement be reached prior to the

remediation and that remediation begin only after a variety of studies took place at the site. Gerke remains ready, willing and able to provide services to remove the fill and debris.

e) THE ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR

In light of the fact that Gerke received $0.00 in payment for the work conducted on the site, and would have received a profit of virtually nothing had all work been completed, will have attorney's fees in excess of $35,000, and that its ability to obtain future contracts has been impaired, the impact of any penalty will be great. The amount of money Gerke has already expended in litigating these issues is well beyond what can be absorbed as a business expense. There is no need for further deterrence to Gerke and generally the penalties imposed against Thorson and Gerke's inclusion in the suit after its de minimis role and culpability will serve to deter others in its position.

f) SUCH OTHER FACTORS AS JUSTICE MAY REQUIRE

In light of the broader context in which this case should be viewed, any penalty imposed against Gerke should be minimal to be in accord with the factors under § 1319(d). As stated, Gerke was a sub-contractor on a small project it engaged in primarily to keep its employees working at a slow time of the year. As a sub-contractor it was not the party responsible for compliance issues. The assurances provided to it by the general contractor that Gerke could go forward, although ultimately incorrect, were reasonable at the time made. Gerke did not proceed with knowledge that it was or could be in violation nor was it reckless in its decision making. The fact that no permit was obtained when one was required did not increase or decrease Gerke's economic gain or incentive in

undergoing the work it contracted to complete. It gained nothing as a result of the violation and would have gained nothing additional had the violation gone undiscovered. Gerke has never previously violated any environmental statute, rule, regulation or requirement. Gerke's reputation has been permanently damaged and this action at completion will have cost in excess of $50,000 in fees. The culpability of Gerke is minimal in comparison to Thorson's.

In addition to the assistance Gerke will provide in remediating the property, a penalty of no more $5,000 dollars is appropriate. That would be $5,000 more than Gerke was paid for its work and $5,000 more than what the economic benefit of the violation would have provided Gerke had the violation gone undiscovered. The site can be fully returned to the condition it was prior to Gerke's involvement. Highlighting the site as a wetland may encourage the city to stop demanding that it be mowed and therefore it can reach its ultimate potential as a natural wetland, assuming someone does not obtain a permit for its development.

The Kelly case is particularly instructive. As cited previously, the EPA sought no penalty against a developer who without a permit filled 90% of a wetland swale that both the EPA and Corps of Engineers believed to be a wetland subject to its jurisdiction. When the developer again placed fill in the wetland the Western District of Wisconsin Circuit Court and the 7th District Court of Appeals upheld a determination that a $3,000 fine against the excavator hired by the developer was appropriate under § 1319(d) of the CWA.

Perhaps most importantly, the Plaintiff has never quantified the extent of any environmental harm at the site. The Plaintiff's experts referenced vague allegations of risk to the environment and to the site without specificity.

Dated this ______ day of March, 2004.

**CARMICHAEL & QUARTEMONT, S.C.**
Attorneys for Defendant, Gerke
Excavating, Inc.

By: ________________________________________
Jay S. Carmichael
State Bar No. 1013775
Martin R. Anderson
State Bar No. 1036093
916 Oak Street, P.O. Box 725
Tomah, Wisconsin 54660
(608) 372-3239